IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD SHARPE,                    :
                                  :
            Plaintiff             :    CIVIL No. 1:14-CV-00779
                                  :
        vs.                       :    Hon. John E. Jones III
                                  :
CAROLYN W. COLVIN, ACTING         :
COMMISSIONER OF SOCIAL            :
SECURITY,                         :
                                  :
            Defendant             :

**MEMORANDUM**

February 11,2015

**BACKGROUND**

The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Donald Sharpe's claim for social security
disability insurance benefits.

Disability insurance benefits are paid to an individual if
that individual is disabled and "insured," that is, the individual
has worked long enough and paid social security taxes. The last
date that a claimant meets the requirements of being insured is
commonly referred to as the "date last insured." It is undisputed
that Sharpe meets the insured status requirements of the Social
Security Act through December 31, 2016. Tr. 11 and 13.[1]

Sharpe was born on April 21, 1979, in upstate New York.

_____

[1]References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of the Answer on June 8,
2014.

Tr. 51, 121, 143, 313 and 341. Sharpe's family moved to Pennsylvania when he was 12 years old. Tr. 330. Sharpe in 1998 while attending the 11th grade was expelled from Ephrata High School located in Lancaster County for assaulting a teacher but within a month of that expulsion he obtained a General Equivalency Diploma. Tr. 313-314, 316 and 330.  Sharpe can read, write, speak and understand the English language and perform basic mathematical functions such as counting change, paying bills, and using a checkbook and money orders. Tr.  27, 154 and 167.

From 1998 to 2002, Sharpe worked for the following companies: WAWA, Inc.; Brownstown Restaurant; Burger King; Liberty Business Information, Inc.; Kmart Corporation; Dollar Tree Stores, Inc. & Subsidiaries; Woolrich, Inc.; McCrory Corporation; and J.J. Newberry Corporation. Tr. 131-132.

In 2002 Sharpe joined the United States Army Reserve and after his basic training he worked for several employers and attended college for one year. Tr. 132 and 315.  Sharpe reported that while he attended college he worked as a 3rd shift manager at a gas station. Tr. 315.

Sharpe's earnings in 2002 were from his military service in the Army Reserve and from employment with, Reach Road Manufacturing Corp., a company located in Williamsport, Pennsylvania, specializing in women's clothing. Tr. 132 and 314. In 2003, Sharpe had earnings from the Army Reserve and from

Suncoast Motion Picture Company and FerrellGas, Inc. Tr. 132-133. In 2004, Sharpe had earnings from Cumberland Farms, Inc., Suncoast Motion Picture Company, and the Army Reserve. Tr. 133.

In 2004 and 2005, Sharpe's Army Reserve Unit was activated and deployed to Iraq for 18 months. Tr. 16, 35 and 315. Sharpe was a military police specialist and during his deployment he accompanied military convoys and also was involved in the entry and clearing of buildings. Tr. 315 and 340. He also worked in communications and as a signal support specialist. Tr. 315.

The medical records reveal that during Sharpe's service in Iraq he was exposed to small arms fire on several occasions and suffered trauma on two occasions from improvised explosive devices. Tr. 316. First, when entering a structure he tripped a wire and set off an explosive device which resulted in injury to his back and head and unconsciousness for three days. Tr. 331-332 and 340. Second, when escorting a convoy the vehicle in which he was riding was hit by an improvised explosive device and he was ejected from the turret of the vehicle resulting in unconsciousness for two days.[2] Tr. 315-316. Sharpe after these incidents continued to serve in Iraq through 2005 and thereafter continued in the Army Reserve until November, 2006 when he signed up for active duty. Tr.

---

[2]Other than being briefly mentioned in the medical records, there are no detailed reports of these two incidents contained within the administrative record. While deployed in Iraq Sharpe commenced seeing a psychiatrist regarding problems sleeping and he was prescribed the antidepressant trazodone. Tr. 315.

315.   During 2006 in addition to his military service, Sharpe was employed by Impact Missions, Inc., a charity located in Southhaven, Mississippi, and by Broadband Network, Services, Inc. Tr. 133-134. While on active duty he reinjured his back during physical training and was medically discharged in December, 2007. Id.  His highest rank was Specialist, E4.[3] Tr. 331.

After being discharged from the Army, he worked for a brief period during the remainder of 2007 for Cobra Security, Inc., a company which provides uniformed security personnel in the state of Mississippi. Tr. 134.  In 2008 Sharpe was employed by the following entities: Impact Missions, Inc.; Retzer Resources, Inc., a fast food restaurant with headquarters located in Greenville, Mississippi; Mississippi Detective & Security Service, Inc.; GEO Group, Inc., an operator of private correctional facilities; Ablest, Inc., a temporary help service; Wal-Mart Associates, Inc.; and Cobra Security, Inc. Tr. 134-135.

Commencing in 2009, Sharpe's primary employment was as a correctional officer at a private prison in Mississippi run by GEO Group, Inc. Tr. 135, 197 and 315.  Sharpe reported that he obtained an Associate's degree in Criminal Justice in May, 2011. Tr. 26-27 and 156.  Sharpe worked as a correctional officer for GEO Group, Inc., until November 8, 2011, when he was terminated because of the

---

[3]The record reveals that he was reduced in rank twice for disciplinary problems. Tr. 340.

4

use of excessive force against inmates on more than one occasion. Tr. 146, 155 and 315.  The record further reveals that Sharpe in 2009 and 2010 worked for Impact Missions, Inc., but there is no indication as to the type of work he performed. Tr. 135.  Also, in 2011, Sharpe worked briefly for Roseburg Forest Products Company but there is no clear[4] indication as to the type of work he performed or whether his employment with that company was before or after he was terminated as a correctional officer. Id.

The records of the Social Security Administration reveal that Sharpe had earnings in the years 1998 through 2011. Tr. 128. Sharpe's annual earnings range from a low of $6518.24 in 1999 to a high of $22,806.91 in 2009. Id.  Sharpe's total earnings during those 14 years were $191,842.00. Id.

A vocational expert described Sharpe's past relevant employment history[5] as follows: (1) correctional officer, semi-

---

[4]One medical record indicates that Sharpe "has not worked consistently since 11-11" and that Sharpe "reported having difficulty focusing on a job where he was using a computer to make press board." Tr. 315. Roseburg Forest Products is a company which produces wood products, including plywood and particle board. Also, the same medical record states that Sharpe reported that "he was unable to work at a fast food restaurant as he felt that the work was beneath his abilities." Id.

[5]Past relevant employment in the present case means work performed by Sharpe during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

skilled, medium work; and (2) military police officer, skilled, medium work.[6] Tr. 45.

Sharp was married twice. Tr. 314 and 339-341. His first

---

[6]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

6

marriage was at age 19 and it ended during his deployment in Iraq. Id.  He remarried in September of 2006. Id.  The second marriage came to an end in November, 2011, at about the time he was terminated as a correctional officer. Id.  After being terminated as a correctional officer and separating from his wife, Sharpe moved in February, 2012, from Mississippi to Pennsylvania and initially lived with his parents. Id.  Sharpe moved in with a girlfriend in August, 2012. Tr. 309 and 314.

The record reveals that Sharpe has a significant history of abusing alcohol. Tr. 316.  Sharpe reported that after his first marriage ended in 2005 "he consumed a fifth of whiskey daily for four years[.]" Id.  As of August, 2012, Sharpe reported that he had "six drinks of alcohol in the past year" and "denied any illicit drug use." Id.

Sharpe protectively filed[7] his application for disability insurance benefits on October 31, 2012. Tr. 11, 121-127 and 143. Sharpe contends that he became disabled on November 8, 2011, because of both physical and mental impairments. Tr. 155.  The physical impairments include right lower extremity radiculopathy,[8]

---

[7]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[8]Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord.  They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result

migraine   headaches,   sleep   apnea,   chronic   low   back   pain,
gastroesophageal reflux disease and frequent vomiting. Tr. 39, 43
and   155.   The   mental   impairments   include   posttraumatic   stress
disorder, bipolar disorder, panic disorder, nightmares and auditory
hallucinations. Tr. 35, 155 and 204.

 During   the   initial   application   process,   Sharpe's
girlfriend,   Denise   Salisbury,   submitted   a   document   entitled
"Function   Report   -   Adult."   Tr.   164-171.   The   document   is   dated
November 19, 2012. Tr. 171.

 In   the   document   Salisbury   reported   that   she   had   known
Sharpe for about one year and that he presently lived with her and
her son in a house in Carlisle. Tr. 164.  Salisbury stated that
Sharpe has "a lot of anxiety issues" when he is around other people
and that he has physical limitations because of the condition of
his back and leg; he takes his medications "with reminders when he
gets up," and he "tries to 'fix' things around the house" but "has
difficulty keeping on a set task;" and he takes care of a cat and
dog by feeding them, cleaning the cat's litter box and taking the
dog outside. Tr. 164-165.  Salisbury noted that she also helps with
the pets. Tr. 165.  Salisbury reported that Sharpe has nightmares
and   that   he   is   a   very   restless   sleeper.   <u>Id.</u>   With   regard   to

---

of disc herniation or an injury causing foraminal impingement of an
exiting nerve (the narrowing of the channel through which a nerve
root passes). <u>See</u>, <u>generally</u>, Radiculopathy, MedicineNet.com,
http://www.medicinenet.com/radiculopathy/article.htm.
(Last accessed February 6, 2015). A herniated disc is one cause of
radiculopathy. <u>Id.</u>

personal care, Salisbury stated that Sharpe has difficulty shaving because his hands shake. Id. Salisbury reported that Sharpe prepares his own meals on a daily basis "but often has trouble with timed things;" he can do light cleaning which does not involve prolonged standing; he cannot use power tools because of his shaky hands; he needs to be reminded to stay on task; he needs encouragement to do housework; he goes outside on a daily basis; he drives a car; and he cannot go out alone or by himself because "when in public situation[s he] can get sudden anxiety issues that prohibit him from being stable" and he has "extreme anxiety attacks[.]" Tr. 166-167. Salisbury reported that Sharpe shops in stores and by computer but "has to be reminded of what he is shopping for." Tr. 167. Salisbury stated that Sharpe's hobbies are "very short [fishing] trips" and watching sports on TV. Tr. 168. Salisbury noted that Sharpe stays home "due to anxiety attacks when in public" and he needs reminders to go to appointments, including medical appointments. Id. She reported that he has problems getting along with family, friends and neighbors and gets angry quickly. Tr. 169.

When asked to check items which are affected by Sharpe's illnesses or conditions Salisbury checked the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, concentration, understanding, following instructions and getting along with others. Id. Salisbury reported

9

that Sharpe has trouble remembering verbal instructions and needs instructions repeated several times and needs reminders to stay on task. Id. Salisbury noted that Sharpe has problems with authority figures, frequent panic attacks when under stress, auditory hallucinations and fear of loud noises. Tr. 170. She further noted that he cannot sit in a restaurant without having a panic attack. Id. Sharpe completed a similar function report on November 19, 2012, which was not inconsistent with the one completed by Salisbury. Tr. 175-179.

Sharpe's application was initially denied by the Bureau of Disability Determination[9] on December 7, 2012. Tr. 11 and 52-66.[10] On January 10, 2013, Sharpe requested a hearing before an administrative law judge. Tr. 69-70. On May 2, 2013, counsel for Sharpe sent a letter to the Chief Administrative Law Judge requesting an expedited hearing under the Wounded Warrior program. Tr. 79. A hearing was held before an administrative law judge on August 8, 2013. Tr. 11 and 23-50.

The record reveals that as of at least February 21, 2012, Sharped was awarded by the United States Department of Veterans

---

[9]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 63.

[10]As part of the initial review process a state agency psychologist and state agency adjudicator completed a 10-page document entitled "Disability Determination Explanation." Tr. 52-61.

Affairs (VA) a service-connected disability rating of 50%, 30% of which was for bipolar disorder, 10% for allergic or vasomotor rhinitis, 10% for lumbosacral or cervical strain, and 10% for hiatal hernia. Tr. 205 and 340.  At the administrative hearing Sharpe testified that in or about August, 2012, he was awarded a 90% disability by the VA. Tr. 34. Specifically, Sharpe testified as follows: "Well, with it being 90 percent, it actually – everything together adds up to 140 percent, because it's 70 percent for my mental health. It's 30 percent for my lumbar spine and leg. It's 10 percent for my GERD. 10 percent for my sinusitis. And 10 percent for something else that I can't remember what.  So, it adds up to 94 – 90 – 140[11] - percent but the way they do the math, it came out to 90 percent." Id.  The actual disability rating decisions of the VA are not contained within the administrative record and the administrative law judge took no steps to obtain them.

The record reveals that in April, 2013, Sharpe suffered another trauma. The house in which Sharpe and his girlfriend were living caught fire and they lost 85% of their belongings and they had to relocate to an apartment. Tr. 198 and 535.

In a document filed on August 6, 2013, with the administrative law judge, counsel for Sharpe stated as follows:

After discharge from the Army, [Sharpe] worked at the

---

[11]The figures mentioned by Sharpe do not add up to 140, but instead 130.

Marshall    County    Correctional    Facility    as    a
lieutenant/supervisor from September, 2008, until the
onset date, 11/8/11. He has taken course work through the
University of Phoenix, and more recently, through Central
Pennsylvania College, however, he has not obtained any
degrees or certificates, and he has struggled with his
grades.  His most recent transcript reports that Claimant
currently has a cumulative GPA of 2.4, and his semester
grades for Spring 2013 averaged to a GPA of 1.94. (Central
Penn College).  On 5/15/13 Claimant received a written
warning that he is required to maintain at least a 2.0 ©
grade point average, and that students not meeting this
requirement are placed on academic probation and are
subject to suspension.

Tr. 205.  Sharpe testified that he obtained an Associate's degree

in Criminal Justice but did not specify the date on which he

received that degree. Tr. 27.

At the administrative hearing on August 8, 2013, Sharpe

testified that he had difficulty putting on socks and shoes because

he can not bend over; when he drops items he picks them up with his

feet; he can use the shower; he does not cook or do laundry; he

does some partial shopping; he can vacuum the downstairs of his

apartment but not the upstairs because he cannot carry the vacuum;

he apparently maintains a yard associated with the apartment; he

drives to and attends Central Penn College but he currently has

failing grades and is on academic probation; he can climb stairs

but not ladders; he can walk about 20 minutes and then pain shoots

up his leg into his back and he has to sit down, recline or lie

down; he can stand 15 to 20 minutes before he has to sit down; when

he is in a standing position he has to shift his weight; he takes

two naps per day for about 1-2 hours; he is apparently involved in

the training of a therapy dog once per week for two hours at the VA Medical Center but his girlfriend takes care of the dog; he builds bird houses and shelves as a hobby; he likes to go fishing; he plays computer games three to four hours per day; he smokes a pack of cigarettes per day; he has two to three panic attacks per month; he has nightmares four to five nights per week; he has episodes where he gets angry and he locks himself in a dark room and his girlfriend cannot be around him and she leaves the apartment; he has difficulty completing projects he starts; and he vomits on a daily basis.  Tr. 27-40.

On September 18, 2013, the administrative law judge issued a decision denying Sharpe's application.  Tr. 11-22.  The administrative law judge found that Sharpe failed to prove that he met the requirements of a listed impairment or suffered from work-preclusive functional limitations through the date of the decision. Id. The administrative law judge concluded that Sharpe could perform a limited range of sedentary work and identified two jobs in that category which Sharpe could perform. Id.  In so finding the administrative law judge discounted the 90% VA disability rating and the function report prepared by Sharpe's girlfriend as well as the one prepared by Sharpe and Sharpe's testimony at the administrative hearing. The administrative law judge stated that the VA "has different program standards" and that it "did not classify [Sharpe] completely unemployable due to his impairments

13

singly or in combination." Tr. 20. In rejecting the girlfriend's function report the administrative law judge merely indicated that the girlfriend was not a disinterested party and she had a "natural tendency to agree with the symptoms and difficulties alleged."[12] Tr. 19.

On November 6, 2013, Sharpe filed a request for review with the Appeals Council and on February 25, 2014, the Appeals Council concluded that there was no basis upon which to grant Sharpe's request for review. Tr. 1-5.

Sharpe then filed a complaint in this court on April 23, 2014. Supporting and opposing briefs were submitted and the appeal[13] became ripe for disposition on September 18, 2014, when Sharpe filed a reply brief.

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007);

---

[12] Sharpe's girlfriend did not testify at the hearing and thus to the extent the administrative law judge was judging her demeanor or credibility, he has no real basis to do so.

[13] Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d

Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[14] (2) has an impairment that is severe or a combination of impairments

---

[14]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

that is severe,[15] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[16] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[17]

Residual functional capacity is the individual's maximum

---

[15]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

[16]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[17]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  <u>Id</u>; 20 C.F.R. § 404.1545; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Sharpe's medical records.[18]

On April 25, 2007, Sharpe underwent an MRI of the lumbosacral spine at the Madigan Army Medical Center located in Tacoma, Washington.  Tr. 275-276.  The MRI revealed disc space dessication with moderate disc space narrowing at the L5-S1 level and mild generalized disc bulges at L3-L4, L4-L5 and L5-S1 levels with minimal indentation of the thecal sac.[19]  <u>Id.</u>  There was also

---

[18]A review of Sharpe's medical records contained within the administrative record reveals significant gaps and missing items of importance.

[19]The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run.  It is a covering (membrane) that surrounds the spinal

mild bilateral neural foraminal narrowing at the L4-L5 and L5-S1 levels.[20] Id.

On January 29, 2008, Sharpe underwent an MRI of the lumbosacral spine at the VA Medical Center located in Memphis, Tennessee. Id. The MRI revealed a bulging disc at the L5-S1 level. Id.

On October 26, 2010, Sharpe underwent a CT scan of the head, face and neck at the Memphis VA Medical Center. Id. The CT scan revealed "some asymmetry in the lateral ventricles" of the brain.[21] Id. It was stated that this was "probably a normal

cord and contains cerebral spinal fluid. Herniated discs which merely impinge the thecal sac without contacting nerve tissue do not cause pain symptoms. See Thecal Sac Impingement, Cure-Back-Pain.Org,http://www.cure-back-pain.org/thecal-sac-impingement.html (Last accessed February 6, 2015).

[20]The foramina are openings along each side of the spine through which nerve roots exit. See Dorland's Illustrated Medical Dictionary, 729-731 (32nd Ed. 2012). Narrowing of the foramen can pinch or compress a nerve root and cause pain. Id.

[21]"The ventricles of the brain are a communicating network of cavities filled with cerebrospinal fluid (CSF) and located within the brain parechyma." Ventricles of the Brain, Overview, Medscape, http://emedicine.medscape.com/article/1923254-overview (Last accessed February 5, 2015). There are 4 ventricles. Id. The largest cavities of the ventricular system are the two lateral ventricles. Ventricles of the Brain, Gross Anatomy, Medscape, http://emedicine.medscape.com/article/1923254-overview#aw2aab6b3(Last accessed February 5, 2015). Parechyma is the functional tissue of an organ as distinguished from connective and supporting tissue. "When excess cerebrospinal fluid accumulates in the ventricles of the brain, they enlarge and the resulting condition is called hydrocephalus. . . [H]ydrocephalus can occur in anyone at any age as a result of stroke, infection, tumors or a brain injury." Causes of Enlarged Ventricles, eHow, http://www.ehow.com/info_8176448 _causes-enlarged-ventricles.html (Last accessed February 5, 2015). One study has indicated that headaches were more common in

variant" and "[n]o focal abnormalities were noted." <u>Id.</u>  The CT
scan also revealed "a large [cerebral spinal fluid] collection in
the posterior fossa with a mega cisterna magna[.]" <u>Id.</u>  It was
stated that this was " a normal variant."[22] <u>Id.</u>

A list of Sharpe's "active [medical] problems" was
prepared at the VA Medical Center in Memphis, Tennessee, on
December 6, 2010. Tr. 230-232. Included on that list were panic
disorder without agoraphobia, gastroesophageal reflux disease,
constipation, history of alcoholism, low back pain, neck pain,
headache, postconsussion syndrome and bipolar disorder. Tr. 230-
231.

On March 7, 2011, Sharpe was examined by Melanie G.
Perkins, M.D., a psychiatrist at the VA Medical Center in Memphis.
Tr. 224-227. Dr. Perkins conducted a clinical interview and during
that interview Sharpe reported having a decreased appetite,
frequent vomiting, panic attacks three times per week, an irritable
mood, nightmares, sleeping only 1-2 hours per night, a
preoccupation with pornography and "sexual addiction." Tr. 224. A

---

individuals with asymmetrical lateral ventricles. Kiroglu, Y., et
al., Cerebral lateral ventricular asymmetry on CT: how much
asymmetry is representing pathology? Journal of Surgical and
Radiologic Anatomy, May 2008, Volume 30, Issue 3, pp. 249-255,
Medscape, http://www.medscape.com/medline/abstract/18253688 (Last
accessed February 5, 2015).

[22]The actual reports of MRIs from 2007 and 2008 and the CT scan
from 2010 are not contained within the administrative record.
These diagnostic tests are commented on in the medical notes of an
evaluation of Sharpe by a physician in November, 2012.

mental status examination was essentially normal. Id. Dr. Perkins concluded that Sharpe under Axis I of the Diagnostic and Statistical Manual of Mental Disorder suffered from bipolar disorder, panic disorder without agoraphobia and she could not rule out posttraumatic stress disorder. Id. Under Axis II relating to personality disorders she noted that Sharpe had cluster B traits[23] and referred to neuropsychological test results of November, 2010. Id. However, the report of that testing is not contained within the administrative record. Dr. Perkins gave Sharpe a Global Assessment of Functioning (GAF) score of 60.[24] Dr. Perkins

---

[23]The Cluster B personality disorders are antisocial, borderline, narcissistic and histrionic.

[24]The GAF score allows a clinician to indicate his or her judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of

discontinued the anti-anxiety medication buspirone; she continued Sharpe's prescription for the antipsychotic medication Abilify (aripirazole);[25] she noted that Sharpe may need to take Valproic acid for mood stabilization and prazosin for nightmares if he did not improve by the next visit;  she discontinued the prescription for the anti-anxiety medication Xanax (alprazolam); and she prescribed the antidepressant Celexa (citalopram)and the anti-anxiety medication Klonopin (clonazepam). Tr. 224-225. Dr. Perkins noted that she would have to obtain "more history at the next visit to clarify [posttraumatic stress disorder] symptoms." Tr. 225.  She also referred him to therapy regarding his reports of a preoccupation with pornography and sexual addiction. Id.

On April 4, 2011, Sharpe had an appointment with Erol M. Thomas, Jr., M.D., a staff physician whose speciality was General Internal Medicine, at the VA Medical Center in Memphis. Tr. 217-221. It appears this appointment was a follow-up relating to Sharpe's complaints of back pain. Tr. 218. Dr. Thomas noted that

---

51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

[25]"Abilify is used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression). It is also used together with other medications to treat major depressive disorders in adults.  Abilify is used to treat irritability and symptoms of aggression, mood swings, [and] temper tantrums[.]" Abilify, Drugs.com, http://www.drugs.com/abilify.html (Last accessed February 3, 2015).

Sharpe's back pain was controlled "fairly well" with Tramadol (a narcotic-like pain reliever used to treat moderate to severe pain) but that the medication had to be discontinued because of a change in his psychiatric medications. Id. Dr. Thomas stated that Sharpe needed a new pain medication for his chronic low back pain. Id. There were no abnormal physical examination findings noted by Dr. Thomas. Tr. 219. Dr. Thomas prescribed the pain medication Lortab, a combination of acetaminophen and hydrocodone. Tr. 220. There was no significant change in Sharpe's active medical issues which were included on the list of December 6, 2010.

The next medical record which we encounter is from February 21, 2012. On that date Sharpe visited the emergency department at the VA Medical Center located in Lebanon, Pennsylvania, complaining of depression and suicidal thoughts. Tr. 338-345. Sharpe reported suffering from increased stress relating to his divorce and having to move in with his parents and that he did not care about anything or what happened to him. Tr. 338. The emergency department physician, John M. Movassaghi, M.D., noted that Sharpe reported suicidal thoughts but no specific plan and Sharpe appeared anxious. Id. It was also noted that Sharpe had not been taking any medications for a week. Tr. 339. Dr. Movassaghi referred Sharpe to a staff psychiatrist, Joseph F. Motacki, M.D., for an evaluation. Tr. 340-345.

After conducting a clinical interview and mental status

24

examination of Sharpe, Dr. Motacki concluded that Sharpe suffered from bipolar disorder, not otherwise specified, and Cluster B personality traits. Id. Dr. Motacki noted a history of degenerative disc disease, lumbar vertebral fracture, and a closed head injury. Tr. 341. The results of the mental status examination performed by Dr. Motacki were essentially normal other than Sharpe exhibited a dysphoric mood;[26] his thought process was over-inclusive;[27] he was distraught over his wife's decision to divorce him; and his insight and judgment were fair. Tr. 343. Dr. Motacki gave Sharpe a GAF score of 53. Id. Sharpe was restarted on Abilify, prescribed the anti-anxiety medication Ativan (lorazepam), and he was advised to consider a psychotherapy referral. Id.

On February 24, 2012, Sharpe had an appointment with Brian J. Fosnocht, M.D., at the VA Medical Center in Lebanon to establish a primary care relationship after moving to Pennsylvania from Mississippi. Tr. 335. Sharpe reported that he suffered from chronic sinusitis and vomiting. Tr. 336. Dr. Fosnocht reviewed an MRI from January, 2008, which revealed mild bulging discs at the L5-S1

---

[26]Dysphoria is condition where an individual feels sad, depressed, anxious, or uneasy. See Medical Glossary, http://medicalglossary.net/Dysphoric_mood.htm (Last accessed February 4, 2015).

[27]Overinclusiveness is where an individual is unable to think in a precise manner and is unable to discount irrelevant information.

levels of the lumbosacral spine. Id. Sharpe reported that physical therapy, injections, and a TENS unit had not been effective in alleviating his pain. Tr. 336.  Sharpe stated that he had been on Neurontin (gabapentin),[28] Vicodin, Lortab and baclofen[29] without any relief of his pain. Id. The reported physical examination findings were essentially normal. Tr. 336-337.  After conducting a clinical interview and the physical examination, Dr. Fosnocht concluded that Sharpe suffered from GERD, chronic constipation, low back pain, headaches, and mental health problems. Tr. 337. After discussing pain treatment options with Sharpe, it was decided to focus on Sharpe's mental health issues and no opiates or other pain medications were prescribed or suggested other than the nonsteroidal anti-inflammatory drug naproxen (Aleve). Id.  The record of this appointment notes that Sharpe was previously diagnosed with a traumatic brain injury (TBI).[30] Id.

_____

[28]Neurontin "is an anti-epileptic medication, also called an anticonvulsant. . . [I]t is used alone or in combination with other medications to treat seizures . . . [I]t is also used to treat nerve pain caused by herpes virus or shingles . . . Neurontin may also be used for [other purposes]." Neurontin, Drugs.com, http://www.drugs.com/neurontin.html (Last accessed February 6, 2015).

[29]Baclofen is a muscle relaxer and antispastic agent and is used to treat muscle pain and stiffness. Baclfofen, Drugs.com, http://www.drugs.com/baclofen.html (Last accessed February 6, 2015).

[30]"Traumatic brain injury occurs when an external mechanical force causes brain dysfunction.  Traumatic brain injury usually results from a violent blow or jolt to the head or body. . .  Mild traumatic brain injury may cause temporary dysfunction of brain cells.  More serious traumatic brain injury can result in bruising,

On March 12, 2012, Sharpe had a follow-up appointment with Michael R. McAllister, D.O., a psychiatrist, at the VA Medical Center located in Lebanon relating to his February 21, 2012, emergency department visit. Tr. 329-335. Dr. McAllister noted that Sharpe had a service-connected disability in the amount of 50%, 30% of which was for a psychiatric condition, bipolar disorder. Tr. 329-330. After conducting a clinical interview and a mental status examination, Dr. McAllister concluded that Sharpe instead of suffering from bipolar disorder suffered from the following conditions: (1) impulse control disorder; (2) depressive disorder, not otherwise specified; (3) anxiety disorder, not otherwise specified (some features similar to posttraumatic stress disorder); and (4) personality disorder, not otherwise specified. Tr. 333. Dr. McAllister gave Sharp a GAF score of 55. Id. Dr. McAllister discontinued Sharpe's prescription for Abilify and listed Sharpe's

---

torn tissue, bleeding and other physical damage to the brain that can result in long-term complications or death." Traumatic Brain Injury, Definition, Mayo Clinic Staff, http://www.mayoclinic.org/diseases-conditions/traumatic-brain-injury/basics/definition/CON-20029302 (Last accessed February 4, 2015). There can be physical, sensory and mental symptoms of traumatic brain injury. Traumatic Brain Injury, Symptoms, Mayo Clinic Staff,http://www.mayoclinic.org/diseases-conditions/traumatic-brain-injury/basics/symptoms/con-20029302(Last accessed February 4, 2015). The physical symptoms can include loss of consciousness for a few seconds to hours, headache, nausea or vomiting and difficulty sleeping. Id. The sensory symptoms can include a bad taste in the mouth and sensitivity to light or sound. Id.  The mental symptoms can include memory or concentration problems, mood changes or swings, depression, anxiety, agitations and combativeness. Id.  The administrative record does not contain Sharpe's military medical treatment records for the injuries he sustained in Iraq and the administrative law judge took no steps to obtain them.

active medications as follows: cetirizine;[31] docusate, a stool softner; gabapentin (Neurontin); lorazepam (Ativan); naproxen; the anti-acid medication omeprazole (Prilosec); prazosin;[32] and the migraine headache medication topiramate (Topamax).[33] Tr. 333-334. The prazosin and topiramate were added to the list by Dr. McAllister after examining Sharpe. Tr. 334.  Dr. McAllister noted that Sharpe had a TBI screening in 2010 which resulted in a TBI diagnosis.[34] Id.

On March 16, 2012, Sharpe had an appointment with Kevin R. Wolford, O.D., an optometrist. Tr. 326-329.  At that appointment Sharpe complained of migraine headaches and floaters in both eyes. Tr. 327. After performing an eye examination, Dr. Wolford concluded that Sharpe suffered from astigmatism with early asthenopia[35] in

---

[31]Cetirizine (Zyrtec) is an antihistamine used, inter alia, to treat allergies. Cetirizine, Drugs.com, http://www.drugs.com /cetirizine-hcl.html (Last accessed February 4, 2015).

[32]Prazosin is an alpha-blocker medication which relaxes the blood vessels allowing blood and oxygen to circulate more freely around the body.  It is primarily used to treat high blood pressure but can be used for other purposes.  Prazosin, Drugs.com, http://www.drugs.com/cdi/prazosin.html (Last accessed February 4, 2015).

[33]Topiramate, Drugs.com, http://www.drugs.com/cdi/ topiramate.html (Last accessed February 4, 2015).

[34]The administrative law judge did not obtain the VA medical records from 2010 relating to that TBI screening.

[35]"Astigmatism is an eye disorder in which the cornea (the clear tissue covering the front of the eye) is abnormally curved, causing out-of-focus vision. It is commonly treated with glasses, contact lenses, or refractive surgery." Astigmatism, MedicineNet.com, http://www.medicinenet.com/astigmatism

both eyes (OU) and issued a prescription for new glasses. Tr. 329.

On April 2, 2012, Sharpe had a follow-up appointment with Dr. McAllister. Tr. 323-326. Dr. McAllister again mentioned Sharpe's service-connected disability of 50% and his TBI diagnosis. Id. Sharpe reported some improvement in his mood. Tr. 326. After conducting a clinical interview and mental status examination Dr. McAllister's diagnoses remained the same except he gave Sharpe a GAF score of 60. Tr. 323-325. Dr. McAllister noted Sharpe did "not make much eye contact," he had an unhappy and resentful mood, and that he had immature insight and judgment. Tr. 324. In all other respects the results of the mental status examination were essentially normal. Dr. McAllister further noted that Sharpe had "a long history of adaptive difficulties[.]" Tr. 325. Sharpe's prescriptions remained the same except it appears that the prescription for lorazepam (Ativan) was discontinued because it is not listed as an active outpatient medication. Tr. 325.

The next relevant medical record is from August 25, 2012, when Sharpe visited the emergency department at the Carlisle Regional Medical Center complaining of a headache, involving pain in the forehead. Tr. 235. Sharpe arrived at the emergency department in a wheelchair. Id. Sharpe described the headache as

_overview/article.htm#astigmatism_introduction (Last accessed February 4, 2015). Asthenopia (eye strain) involves headache, fatigue, occasional double vision, blurred vision, and pain in and around the eyes. See Dorland's Illustrated Medical Dictionary, 168 (32nd Ed. 2012).

aching, constant, throbbing and unrelenting, and associated with anxiety and nausea. Id.  Sharpe also reported suffering from insomnia.  Tr. 236.  There were no abnormal physical examination findings reported but it was stated that Sharpe's gait was not assessed. Tr. 236-237.  As for Sharpe's mental state it was noted that he was anxious, aggressive and animated. Tr. 237.  Over a period of 1 1/4 hours he was given the following medications: Ativan, Toradol,[36] Benadryl and Vicodin. Tr. 238.  Sharpe's pain subsided after he was given Vicodin. Id.  He was discharged the same day in a stable condition with a diagnosis of intractable migraine, cephalgia (headache), anxiety reaction and PTSD. Id.  At discharge he was given prescriptions for ibuprofen (Advil), Percocet and Valium. Tr. 234.

On August 27, 2012, Sharpe was evaluated by Brad M. Todd-Pillman, Ph.D., a staff psychologist, at the VA Medical Center located in Lebanon. Tr. 310-320. This evaluation apparently was in connection with a request by Sharpe for an increase in his VA disability rating. Tr. 309. After conducting a clinical interview and mental status examination, Dr. Todd-Pillman concluded that Sharpe suffered from cyclothymic disorder[37] and anxiety disorder,

---

[36]Toradol is a nonsteroidal anti-inflammatory drug used to treat moderate to severe pain. Toradol, Drugs.com, http://www.drugs.com/toradol.html (Last accessed February 5, 2015).

[37]Cyclothymic disorder is a condition where the individual has mood swings but the symptoms are less severe "than occur in full-blown bipolar disorder." Bipolar Disorder Health Center, Cyclothymia (Cyclothymic Disorder) WebMD, http://www.webmd.com

not otherwise specified, and gave Sharpe a GAF score of 55. Tr. 310-311.   Dr. Todd-Pillman indicated that Sharpe had some PTSD traits but that he did not meet the full criteria to be diagnosed with that condition. Tr. 319-320.  However, in his report Dr. Todd-Pillman erroneously indicated that Sharpe had never been diagnosed with TBI. Tr. 313.

Dr. Todd-Pillman noted that during the interview Sharpe was restless and withdrawn; he tended to pull his baseball hat down over his face and avoid eye contact; and his affect was dysthymic.[38] Tr. 317. Otherwise, the results of the mental status examination were essentially normal. Id.  Dr. Todd-Pillman stated that Sharpe's symptoms associated with the above diagnoses were as follows: (1) panic attacks that occur weekly or less often; (2) chronic sleep impairment; (3) flattened affect; (4)disturbance of motivation and mood; (5) difficulty in establishing and maintaining effective work and social relationships; and (6) difficulty in adapting to stressful circumstances, including work or a worklike setting. Tr. 317-318. Dr. Todd-Pillman opined that Sharpe was "capable of maintaining full-time, gainful employment in either and physical (sic) or sedentary job, however, his psychiatric symptoms

_____

/bipolar-disorder/guide/cyclothymia-cyclothymic-disorder (Last accessed February 5, 2015).

[38]Dysthymia "is a mild but long-term (chronic) form of depression." Dysthymia, Definition, Mayo Clinic Staff, http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/CON-20033879 (Last accessed February 7, 2015).

will likely result in moderate occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation."[39] Tr. 320.

Also on August 27, 2012, Sharpe underwent a series of x-rays of the lumbosacral spine which revealed normal alignment and curvature of the lumbar spine; well-maintained vertebral body heights and intervertebral disc spaces; no evidence of fracture, spondylolisthesis[40] or spondylolysis;[41] and normal posterior elements, paravertebral soft tissues and sacroiliac joints.[42] Tr. 487.

On September 10, 2012, Sharpe was transported to the emergency department at Carlisle Regional Medical Center by

---

[39]As noted earlier in this memorandum the administrative record does not contain a copy of the VA's initial disability rating decision or a copy of the decision with respect to Sharpe's request for an increase.

[40]Spondylolisthesis is where one vertebra of the spine slips forward over the vertebra below it. See Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012).

[41]A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. Spondylolysis is basically a stress fracture or breakdown of the components of a vertebra. See Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012).

[42]An MRI is generally more precise in revealing some anatomical defects, such as disc dessication, bulging and herniated discs and narrowing of the foramina.

ambulance with complaints of anxiety. Tr. 240-245.  After being examined and treated with various medications including Ativan, Haldol[43] and Percocet, he was discharged on the same day with a diagnosis of a muscle strain, anxiety reaction and panic disorder. Id.  The record of this visit indicates that his "[h]ome med[ication]s" were Abilify, Klonopin, Neurontin, Imitrex (a drug used to treat migraine headaches), Vicodin, Prevacid, buspirone, Motrin and the antibiotic Augmentin. Tr. 241. The medical record further indicates that Sharpe had a history of PTSD, TBI, two herniated discs, a sciatic nerve partially severed, testicular cancer, migraines, and  bipolar disorder. Tr. 242.

On September 18, 2012, Sharpe had an appointment with Kavita P. Dave, D.O., a primary care physician at the VA Medical Center located in Lebanon. Tr. 305-309. At this appointment Sharpe complained of frequent vomiting (throwing up for the past 8 years), panic attacks, migraine headaches, sciatic nerve pain and allergies. Tr. 306-307. Sharpe also reported sensitivity to light. Tr. 307. The medical record of this appointment does not contain any significant objective physical examination findings other than vital signs and a body mass index (BMI) of 33.7 which reveals that

---

[43]Haldol is an antipsychotic drug used to treat schizophrenia and is also used to control symptoms associated with Tourette's syndrome but may be used to treat other conditions as well. Haldol, Drugs.com, http://www.drugs.com/cdi/haldol.html (Last accessed February 4, 2015).

Sharpe was obese.[44] Tr. 307. Dr. Dave's assessment was that Sharpe suffered from GERD with a possible gastrointestinal bleed, migraine headaches, panic disorder/bipolar disorder, allergic rhinitis with a deviated septum, and low back and sciatic pain. Tr. 308.  Dr. Dave referred Sharpe to a gastroenterologist, psychiatrist and ear, nose and throat specialist for consultations; increased Sharpe's dosage of Prilosec; and continued Sharpe's prescriptions for Zyrtec and Neurontin. Id.

On September 21, 2012, Sharpe was examined by Haroon A. Shaikh, M.D., at the VA Medical Center located in Lebanon. Tr. 302-305.  During this appointment Sharpe reported several different symptoms including vomiting once or twice a day and an abnormal metallic taste in his mouth. Tr. 302. He also reported that recently he had seen at least on one occasion blood in his vomitus. Id.  After conducting a clinical interview and examining Sharpe, Dr. Shaikh's clinical impression was that Sharpe suffered from intractable vomiting and dysgeusia (distortion of sense of taste) of uncertain etiology, and recommended that Sharpe undergo an upper GI series and small bowel series of tests. Tr. 304.  Sharpe was scheduled for an esophagogastroduodenoscopy (EGD) on October 18, 2012. Tr. 305.

On September 24, 2012, Sharpe had an appointment with Aida

---

[44]Adults with a BMI of 30 or higher are considered obese. Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www. Mayoclinic.com/health/obesity/DS00314 (Last accessed January 7, 2014) Id.

Rjepaj, M.D., a psychiatrist, at the VA Medical Center located in Lebanon. Tr. 298-301.  At this appointment Sharpe reported a long history of anxiety and mood symptoms and recent panic attacks and anger issues. Tr. 299. Sharpe reported that he sleeps poorly at night because of nightmares related, inter alia, to his deployment in Iraq. Id.  He further stated that the nightmares occur several times a week and he has panic attacks once or twice a week. Id. Dr. Rjepaj noted that in addition to anger issues, nightmares and insomnia, that Sharpe had some degree of hypervigilance. Id.  Dr. Rjepaj also indicated that Sharpe "gives a [history of]  bipolar disorder that dates back to his teenage years" and has a family history "strongly positive for mood disorder." Tr. 300. The results of a mental status examination performed by Dr. Rjepaj of Sharpe were essentially normal. Tr. 300-301. Dr. Rjepaj's diagnostic impression was that Sharpe suffered from bipolar disorder and anxiety disorder and he gave Strong a GAF score of 60. Tr. 301. Dr. Rjepaj stated that Sharpe "has a biological predisposition for psychiatric disorders and a long history of mood disorder that fits the diagnostic criteria for bipolar disorder . . . There is also evidence of anxiety in the form of panic attacks as well as some PTSD symptoms, that do not quite fulfill the diagnostic criteria for PTSD syndrome at this time. Currently, patient is mainly experiencing panic attacks and anger issues." Id.  Dr. Rjepaj

prescribed the drug Tegretol (carbamazepine)[45] for its mood stabilizing properties and to address Sharpe's anger issues and the drug clonazepam (Klonopin) on an as needed basis for anxiety. Id.

On September 26, 2012, Sharpe was evaluated by Christine D. Seiler, a registered and licensed occupational therapist, at the VA Medical Center located in Lebanon. Tr. 296-298. At this appointment Sharpe reported that he presently had pain in his back and right lower extremity rated as a 4 on a scale of 1 to 10. Tr. 296. He further stated that his pain is chronic and that it occurs on a daily basis. Id. Sharpe reported that he remains independent with respect to activities of daily living and ambulation although sometimes he has to use an assistive device to walk because of pain. Id. According to Ms. Seiler, Sharpe specifically commented that he has no restrictions in his daily activities despite his back pain and that "if it needs to be done, [he does] it." Id. Sharpe expressed a desire to seek education and employment in the culinary arts. Id. A functional examination by Ms. Seiler revealed the following: (1) Sharpe's upper extremity range of motion was within functional limits; (2) he had no deficits in upper extremity gross coordination; (3) his hand grip strength was slightly decreased bilaterally; (4) his hand lateral pinch strength was

---

[45]Tegretol "is an anticonvulsant. It works by decreasing nerve impulses that cause seizures and pain. Tegretol is used to treat seizures . . . [I]t is also used to treat bipolar disorder." Tegretol, Drugs.com, http://www.drugs.com/tegretol.html (Last accessed February 4, 2015).

slightly decreased bilaterally, but more so on the right; (5) he

had diminished hand performance bilaterally with respect to the 9

hole peg test;[46] (6) he had no deficits with respect to fine motor

coordination; (7) he denied numbness or tingling in the bilateral

upper extremities; (8) his vision, hearing and speech were within

functional limits; (9) his static or isometric lifting capacity was

70 pounds occasionally (less than 1/3 of the work day) and 35

pounds frequently (less than 2/3 of the work day)[47]; and (10) his

static and dynamic sitting and standing balance were rated good.

Tr. 297-298.   Sharpe did tell Ms. Seiler that he could tolerate

sitting for 30-45 minutes at a time and then he needed to change

positions or walk because of back spasms and increased pain; he

stated that he could tolerate standing and walking for 1 hour at

a time and then he needed to sit to rest due to back pain; and he

had no limitations with climbing stairs or bending, twisting,

---

[46]The nine hole peg test assesses finger dexterity.

[47]Ms. Seiler did not indicate how the isometric (static) test
results translated to a dynamic work situation. At least one study
has suggested that isometric strength assessments do not accurately
predict dynamic lifting capacity. See Feeler, L., et al., Isometric
strength assessment, part 1: static testing does not accurately
predict dynamic lifting capacity, U.S. National Library of
Medicine, National Institute of Health, http://www.ncbi.nlm.
nih.gov/pubmed/20978337 (Last accessed February 4, 2015). It has
also been noted that "[d]ynamic lift tests are often a better
simulation of the task being assessed and may be more appropriate
for a back-injured population." Rosecrane, John C., et al., A
comparison of isometric strength and dynamic lifting capacity in
men with work-related low back injuries, Journal of Occupational
Rehabilitation, September 1991, Volume 1, Issue 3, pp. 197-205,
http://link.springer.com/article/10.1007%2FBF01073456 (Last
accessed February 4, 2015).

stooping or squatting. Id. However, there is no indication that Sharpe admitted that he could engage in the above activities on a full-time basis (8 hours per day, 5 days per week).

Sharpe was evaluated on October 16, 2012, by Donald S. Harper, M.D., an allergy specialist. Tr. 249-255. After conducting allergy testing and a physical examination, Dr. Harper concluded that Sharpe suffered from perennial allergic rhinitis, chronic sinusitis, a deviated nasal septum towards the left, a positive food allergy to lobster, chronic cough consistent with a restrictive ventilatory physiology, tobacco use, conjunctivitis, photophobia, and contact dermatitis to iodine and adhesive. Tr. 251. Dr. Harper recommended that Sharpe stop smoking and he prescribed an EpiPen (epinephrine injection), Zyrtec, Singulair and Ventolin HFA (albuterol sulfate), an inhaler. Tr. 252.

On October 18, 2012, Sharpe underwent an EGD performed by Dr. Shaikh at the VA Medical Center located in Lebanon. Tr. 347-351. The EGD visually revealed that Sharpe suffered from the following: (1) moderately severe, segmented, grade III LA Class B erosive reflux-induced esophagitis in the lower third of the esophagus, 2 centimeters from the entry site into the stomach; and (2) patchy areas of mild non-errosive gastritis on portions of the lining of the stomach (incisura and greater curvature). Tr. 347-348. During the EGD a tissue biopsy was performed of the stomach lining. Tr. 270. Microscopic examination of the tissue revealed

38

mild chronic gastritis. <u>Id.</u> Sharpe was also diagnosed as suffering from a hiatal hernia. Tr. 396.

On October 29, 2012, Sharpe had an appointment regarding his anxiety and bipolar disorder with Dr. Rjepaj at the Lebanon VA Medical Center. Tr. 282-283. Sharpe reported improvement in his condition since his last visit with Dr. Rjepaj. <u>Id.</u> The results of a mental status examination were normal. <u>Id.</u> Dr. Rjepaj's diagnostic assessment was that Sharpe suffered from bipolar disorder and anxiety disorder and gave him a GAF score of 60. Tr. 283. Dr. Rjepaj further noted that Sharpe was "doing much better at this time and has responded well to the current medications."[48] <u>Id.</u> Dr. Rjepaj did, however, increase Sharpe's dosage of Tegretol in order to obtain "better control of [Sharpe's] anger issues." <u>Id.</u> Dr. Rjepaj continued Sharpe's prescription for Klonopin. <u>Id.</u>

On November 6, 2012, Sharpe had a follow-up appointment with Dr. Rjepaj at which Sharpe reported that his mood symptoms and anger symptoms were improved but that for the past 6-7 months he had been experiencing intermittent auditory hallucinations "once a month or so." Tr. 280. Sharpe also reported difficulty sleeping "in part due to nightmares." <u>Id.</u> The results of a mental status examination were essentially normal. Tr. 281. Dr. Rjejap diagnostic assessment remained the same but he prescribed the medication

---

[48]As of October 18, 2012, Sharpe's active medications were as follows: Tegretol, Zyrtec, Klonopin, docusate, Neurontin, naproxen, and omeprazole. Tr. 285.

Abilify for Sharpe's auditory hallucinations. Id.

At an appointment with Dr. Harper, the allergist, on the same day, Sharpe reported that his allergy symptoms were stable as a result of taking Zyrtec. Tr. 246.  It was noted that his dosage of Tegretol was increased and that he was just given a prescription for Abilify.[49] Id. Sharpe denied any "active headache." Id.

On November 14, 2012, Sharpe was evaluated regarding his complaints of headaches by Christine M. Heath, M.D., a neurologist, at the Lebanon VA Medical Center. Tr. 272-280.  Sharpe reported headaches which "typically last for hours to days" and occur once per week. T4. 272. Dr. Heath reported that Sharpe's active medications were Abilify, Tegretol, Zyrtec, Klonopin, docusate, EpiPen, Neurontin and the anti-acid medication Pantoprazole. Tr. 273-274.  Sharpe was accompanied to this appointment by his girlfriend and during Dr. Heath's clinical interview of Sharpe, the girlfriend reported that Sharpe snored and that she witnessed apneas, times when Sharpe stopped breathing while sleeping. Tr. 274.  Sharpe's girlfriend further reported that she occasionally observed Sharpe's "left eye wandering" when he is very tired or in pain with a headache. Id. A physical examination of Sharpe performed by Dr. Heath revealed that vibration sensation was reduced in the  extremities, but more so in the lower extremities;

_____

[49]See fn. 25, *supra*.

the Romberg test was positive;[50] and Sharpe's tandem gait was
impaired.[51] Tr. 276. After conducting the clinical interview and
physical and neurological examinations, Dr. Heath's diagnostic
assessment was that Sharpe suffered from chronic neck and back
pain; peripheral neuropathy;[52] and a headache complex involving
migraines and occipital neuralgia.[53] Tr. 277. Dr. Heath made

---

[50]Romberg test is a neurological test to detect poor balance.
It detects the inability to maintain a steady standing posture with
the eyes closed.

[51]A tandem gait is where the toes of the back foot touch the
heel of the front foot at each step.

[52]"Neuropathy is a collection of disorders that occurs when
nerves of the peripheral nervous system (the part of the nervous
system outside of the brain and spinal cord) are damaged.  The
condition is generally referred to as peripheral neuropathy, and it
is most commonly due to damage to nerve axons [nerve fibers].
Neuropathy usually causes pain and numbness in the hands and feet.
It can result from traumatic injuries, infections, metabolic
disorders, and exposure to toxins. . . Neuropathy can affect nerves
that control muscle movement (motor nerves) and those that detect
sensations such as coldness or pain (sensory nerves). . . Pain from
peripheral neuropathy is often described as a tingling or burning
sensation." Medical New Today, What is Neuropathy? Neuropathy
Causes and Treatments, http://www.medicalnewstoday.com/articles
/147963.php (Last accessed February 5, 2015). The Mayo Clinic
website indicates that "[i]n many cases, peripheral neuropathy
symptoms improve with time – especially if the condition is caused
by an underlying condition that can be treated. A number of
medications often are used to reduce the symptoms of peripheral
neuropathy." Peripheral neuropathy, Definition, Mayo Clinic staff,
http://www.mayoclinic.com/health/peripheral-neuropathy/DS00131
(Last accessed February 5, 2015).

[53]"Occipital neuralgia is a disorder in which a problem with
the occipital nerve in the back of the skull causes pain between
the back of the head and the scalp, as well as pain, tingling,
numbness, weakness, and possible damage to the nerves and muscles
in the back of the neck. . . Occipital neuralgia is most commonly
the result of trauma, such as whiplash or surgery.  However,

41

several recommendations, including an occipital nerve block injection. Tr. 277-279.

On December 6, 2012, Sharpe underwent a sleep study at a sleep disorder clinic in Harrisburg which revealed that he suffered from mild obstructive sleep apnea. Tr. 354-359.

Also, on December 6, 2012, John Gavazzi, Psy.D., a psychologist, apparently reviewed Sharpe's medical records on behalf of the Bureau of Disability Determination, and concluded that Sharpe suffered from severe bipolar disorder and anxiety disorder, not otherwise specified, but that those impairments did not meet the criteria of any listed impairment. Tr. 55-56 and 58-59. Dr. Gavazzi did not examine Sharpe and merely conducted a records review and it is not clear what records he reviewed. Id. Dr. Gavazzi found that Sharpe was only moderately limited in some of his work-related mental functional abilities and that from a mental standpoint he could "perform simple, routine, repetitive work in a stable environment. Id. Sharpe's medical records were not reviewed by a state agency physician and there is no work-related physical or mental functional capacity assessment from a

---

anything that irritates or compresses the occipital nerve may cause occipital neuralgia, including tight muscles, . . . ." What is occipital neuralgia?, healthgrades, http://www.healthgrades.com/ conditions/occipital-neuralgia (Last accessed February 5, 2015). Often no cause is found for this condition but there are many conditions associated with it, including trauma to back of the head. Occipital Neuralgia, WebMD, http://www.webmd.com/migraines-headaches/occipital-neuralgia-symptoms-causes-treatments#3 (Last accessed February 5, 2015).

state agency physician in the administrative record. Id. The Disability Determination Explanation was completed merely by Dr. Gavazzi and Catherine Ugarte, a non-physician state agency adjudicator. Tr. 52-61.

On December 11, 2012, Sharpe had an appointment at the Lebanon VA Medical Center and underwent a preventive health screening. Tr. 409. On that date Sharpe's pain in the lower back and legs was rated as a 5 on a scale of 1 to 10. Id. His active medications were listed as Abilify, Tegretol, Zyrtec, Klonopin, docusate, EpiPen, Neurontin and pantoprazole. Tr. 405-406. Also, on December 11, 2013, Sharpe was evaluated by Dr. Rjepaj. Tr. 407-408. During a clinical interview Sharpe reported improvement in his psychiatric symptoms and the results of a mental status examination performed by Dr. Rjepaj were normal. Id. Dr. Rjepaj's diagnostic assessment remained the same - bipolar disorder and anxiety disorder - and he gave Sharpe a GAF score of 65. Tr. 408-409.

The medical records reveal that as of December 17, 2012, Sharpe's medications remained the same except there was a pending increase in the dosage of Neurontin and there was a pending prescription for a pain cream (Menthol/m-salicylate 10-15% Top Cream) which were both ordered by Dr. Dave, the primary care physician. Tr. 400-402. Dr. Dave also ordered an MRI and referred Sharpe for a pain management consultation to determine whether he

43

should undergo an occipital nerve block injection. Tr. 402.  Dr. Dave noted that Sharpe was obese with a Body Mass Index of 33.7. Tr. 403.

On January 3, 2013, Sharpe had a therapy appointment with Nancy E. Laudermilch, a licensed clinical social worker at the Lebanon VA Medical Center. Tr. 393-395.  Sharpe's girlfriend accompanied him to this session. Id.  During the session Sharpe reported that he only slept a few hours the previous night because of nightmares and that he continues to have nightmares about 3 times per week. Tr. 393. Sharpe reported chronic headaches. Tr. 394.  It was reported that Sharpe "did a lot of visiting over the holidays" and "was able to cope for short periods of time and then would take a break in the car." Tr. 393-394. It was also noted that Sharpe was scheduled to start school within a week at Central Penn College located in Harrisburg. Tr. 393.  The therapist noted that Sharpe was "not very receptive to therapeutic suggestions of relaxation, coping skills and changing thought patterns but the strategies were discussed." Tr. 394.  The therapist reported under mental status findings that Sharpe held his hands at his temples with his eyes down; his mood was irritable; his affect was argumentative; and his insight and judgment were fair. Tr. 394-395. Otherwise, the results of the mental status examination were normal. Id.  The therapist's diagnostic assessment was that Sharpe suffered from bipolar disorder and she gave him a GAF score of 60.

Tr. 395.

On January 16, 2013, Sharpe underwent an MRI of the cervical spine which revealed unremarkable results. Tr. 380-381. As of January 16, 2013, Sharpe's medications remained the same. Tr. 392. On January 18, 2013, Dr. Dave notified Sharpe that the results of his cervical MRI were normal and inquired if Sharpe was interested in an occipital nerve block injection as suggested by neurology. Tr. 388. On January 28, 2013, Sharpe notified Dr. Dave that he was interested in proceeding with an occipital nerve block injection. Tr. 389.

On January 29, 2013, Sharpe had a therapy appointment with Ms. Laudermilch. Tr. 384-387. Sharpe reported that he had an anger episode over the past weekend and 3 days of a "somewhat manic mood." Tr. 385. Sharpe reported that he had been "successful in school so far this semester." Id. Sharpe also "described a sense of not caring much about others in general, not pursuing relationship connections. He described being very close to his brother growing up but does not keep in touch much now." Id. Ms. Laudermilch noted that it was "unclear how much the TBI history [was] impacting [Sharpe's] presentation." Id. Sharpe noted that he had ongoing headaches and that he was being considered for an occipital nerve block injection. Id. Other than Sharpe reporting a loss of long term memory, the results of a mental status examination were essentially normal. Tr. 385-386. Ms. Laudermilch's

45

diagnostic assessment was bipolar disorder and TBI by history and she gave him a GAF score of 60. Tr. 386.

The administrative record contains medical records indicating that on February 4, 2013, Sharpe underwent a vocational rehabilitation evaluation on that date. Tr. 383 and 444. However, the report of that evaluation is not contained within the administrative record. Furthermore, there is no indication that the administrative law judge considered that evaluation or took steps to obtain a copy of the evaluation report.

On February 11, 2013, Sharpe was evaluated at the Carlisle Regional Medical Center by Salah Eldin Eldohiri, M.D., with respect to his low back and leg pain and his headaches. Tr. 480-481. During the clinical interview, Sharpe reported that on a scale of 1 to 10 his pain averages 6; he has pain in the neck and weakness in the right leg; he has numbness in both hands and feet; and the pain is constant, deep, throbbing, exhausting and gets worse with physical activity and gets better with rest. Tr. 480. A physical examination revealed that provocative pain testing of the lumbar spine was positive bilaterally, but worse on the right side. Id. Provocative pain testing of the cervical spine was also positive bilaterally. Id. Furthermore, "[p]alpation of the bilateral occipital nerves elicit[ed] tenderness." Id. After conducting the clinical interview and the physical examination, Dr. Eldohiri's diagnostic impression was that Sharpe suffered from neck pain,

46

possible cervical arthropathy, bilateral occipital neuralgia, low back pain, bilateral sacroiliac joint arthropathy, and bilateral facet arthropathy in the lumbar area. Tr. 481. On February 18, 2013, Dr. Eldohiri administered a greater and lesser occipital nerve block. Tr. 478. However, it did not have any lasting impact because on March 7, 2013, Sharpe reported chronic headaches. Tr. 423.

On February 22, 2013, Sharpe had an appointment at the Lebanon VA Medical Center with Dr. Rjepaj regarding his anxiety. Tr. 434-436. Sharpe reported "a setback on his anxiety symptoms for the past 5-6 weeks." Tr. 435. Sharpe stated that he was in school and his grades were still good but he "dread[ed] going to class" and "he [could not] handle being among other people." Id. Sharpe reported two panic attacks in the previous two weeks. Id. He reported that he is using his CPAP machine at night for his sleep apnea but that he unknowingly takes it off during the night. Id. He also reported low back pain. Id. The results of a mental status examination were essentially normal. Id. Dr. Rjepaj's diagnostic assessment remained the same and he gave Sharpe a GAF score of 65. Id. Dr. Rjepaj noted that Sharpe was experiencing an increase in anxiety and advised Sharpe to use Klonopin as needed for anxiety and he also increased Sharpe's dosage of Abilify to address depressive symptoms. Tr. 436.

On March 5, 2013, Sharpe had a therapy appointment with

Ms. Laudermilch at which Sharpe reported that he was having increased difficulty with anxiety particularly as the school semester had progressed. Tr. 431. He further stated that he did not notice much benefit so far from the recent changes in his psychiatric medications. Id. A mental status examination revealed that Sharpe's mood was anxious. Id. Otherwise, the findings were essentially normal. Id. Sharpe was given a GAF score of 63. Tr. 432.

On March 7, 2013, Sharpe visited the emergency department at the Lebanon VA Medical Center complaining of disequilibrium, i.e., feeling disoriented. Tr. 423 and 429. Sharpe stated that he was at school and it felt like the environment was moving around him. Tr. 423. Sharpe reported a chronic headache for 7 days straight. Tr. 430. He also reported an increase in the number of nightmares. Id. A physical examination revealed that he suffered from a nystagmus[54] with respect to the left gaze and that vertigo[55] could be elicited by standing him up straight with his head turned to the left. Tr. 424. Otherwise the results of a physical examination were essentially normal. Id. Blood tests did reveal a high white blood cell count[56] but no alcohol was detected. Id.

---

[54]A nystagmus is a condition of rapid, repetitive, involuntary eye movements often resulting in reduced vision.

[55]Vertigo is the feeling that you or your environment is moving or spinning.

[56]This is not the first time blood tests revealed a high white blood cell count. Tr. 264. A high white blood cell count can be

Sharpe was administered various medications, including meclizine (one brand name Dramamine).[57] Id. Sharpe's headache subsided and his vertigo resolved and he was steady on his feet. Id. He was discharged from the VA Medical Center the same day in an improved state and advised to follow-up with his primary care physician within one week. Id. On March 12, 2013, contact was made with Sharpe by VA Medical Center staff and Sharpe reported that he had no further episodes of dizziness. Tr. 421.

On April 3, 2013, Sharpe was successfully treated at the Carlisle Regional Medical Center for smoke inhalation sustained as the result of a fire at the house Sharpe and his girlfriend rented. Tr. 501-514. As stated earlier Sharpe and his girlfriend lost 85% of their belongings. Tr. 531 and 535. After the fire Sharpe and his girlfriend temporarily stayed at a hotel but then eventually moved into an apartment. Tr. 419 and 539.

On April 10, 2013, Sharpe had a therapy appointment with Ms. Laudermilch. Tr. 534-536. At the appointment Sharpe reported on the circumstances of the fire, including that his dog woke him up and he was able to assist his girlfriend and their 2 dogs to escape the fire. Tr. 535. He noted that they lost 85% of their

---

caused by several factors, including infection, the side effects of certain medications and smoking. The record reveals that Sharpe at times smoked up to three packs of cigarettes per day. Tr. 519.

[57]Meclizine is an antihistamine and it "is used to treat or prevent nausea, vomiting, and dizziness caused by motion sickness." Meclizine, Drugs.com, http://www.drugs.com/meclizine.html (Last accessed February 6, 2012).

belongings, they had insurance and that they were presently staying at a hotel in Carlisle. Id. With respect to Sharpe's mental status, Ms. Laudermilch reported that Sharpe's mood and affect were depressed, that he appeared tired, and that he kept his sunglasses on during the session. Id. Otherwise, the results of a mental status examination were essentially normal. Tr. 535-536.  Ms. Laudermilch noted a history of PTSD and anxiety disorder and gave Sharpe a GAF score of 64. Tr. 536.

On April 11, 2013, a registered nurse spoke with Sharpe by telephone regarding making an appointment with a psychiatrist. Tr. 530. Sharpe reported that he was "very stressed about his current situation" and that he "would welcome an earlier appointment with Dr. Rjepaj." Id.  Sharpe told the nurse that he was able to obtain all his medications from Dr. Dave[58] but he was having problems with panic attacks. Id.  Sharpe denied suicidal ideation. Id.  On April 12, 2013, the same nurse again spoke to Sharpe and informed him that an appointment with Dr. Rjepaj was scheduled for April 16, 2013, and he was also informed of an appointment on the same day to replace his CPAP machine which was lost in the fire. Id.

On April 16, 2013, Sharp was provided with a new CPAP machine. Tr. 524. Also, on that date Sharp had an appointment with Dr. Rjepaj regarding his anxiety and bipolar symptoms. Tr. 527-529.

---

[58]A record of the VA Medical Center dated April 11, 2013, indicates that Sharpe's active medications were as follows: Abilify, Tegretol, Zyrtec, Klonopin, docusate, EpiPen, Neurontin, Menthol/m-salicylate 10-15% Tope Cream, and pantoprazole. Tr. 532.

Sharpe during the appointment reported that he felt anxious, tense, and was having more panic attacks. Tr. 527. Sharpe noted that he suffered from poor sleep at night and "often wakes up in panic." Id. Sharpe also reported some depression but that anxiety was the predominant feature and his energy level and appetite were diminished. Id. Sharpe stated that he keeps busy and active and "goes to school everyday and makes himself do all the things he has to do." Id. The results of a mental status examination were normal except Sharpe's mood was dysthymic "with congruent effect of restricted range and intensity." Tr. 528. Sharpe exhibited anxiety and some depression. Id. He was judged to be a low risk for suicide at the present time. Id. Dr. Rjepaj's diagnostic assessment was that Sharpe suffered from bipolar disorder and anxiety disorder and he gave Sharpe a GAF score of 65. Id. Dr. Rjepaj increased Sharpe's dose of Klonopin but stated that he anticipated that Sharpe's symptoms would subside once Sharpe and his girlfriend settled the fire loss with their insurance company and at that point the previous dose of Klonopin would suffice. Id. Sharpe had a follow-up appointment with Dr. Rjepaj on June 19, 2013, at which time Sharpe reported an improvement in his situation. Tr. 552-553. The results of a mental status examination were essentially normal. Id. Dr. Rjepaj's diagnostic assessment remained the same and he reduced Sharpe's dosage of Klonopin. Tr. 553. Otherwise, Sharpe's medications remained the same. Tr. 551.

On April 18, 2013, Dr. Heath, the neurologist, examined Sharpe a second time. Tr. 518-523.   After conducting a clinical interview and physical and neurological examination, Dr. Heath's diagnostic assessment remained the same. Id.  Sharpe suffered from peripheral neuropathy and a headache complex involving migraines and occipital neuralgia. Id.  Sharpe's active medications remained the same. Tr. 519-520. On this date Sharp rated his pain a 7 on a scale of 1 to 10. Tr. 523.  The location of Sharpe's pain was noted to be his head and the cause being a migraine. Id.

On June 21, 2013, Sharpe had an appointment with Dr. Dave regarding complaints of headaches and vomiting. Tr. 547-550. No significant objective physical examination findings were recorded by Dr. Dave at this appointment. Tr. 548-549. Dr. Dave did note that Sharpe had a body mass index of 35 and was wearing sunglasses during the appointment. Tr. 548.  Dr. Dave's diagnostic assessment was that Sharpe suffered from GERD, migraines, panic disorder, bipolar disorder, low back pain, and allergic rhinitis with a deviated septum.  Tr. 549.  Sharpe's  medications essentially remained the same. Id.

On July 3, 2013, Sharpe was evaluated a second time by Ms. Seiler, the occupational therapist, at Lebanon VA Medical Center. Tr. 542-544. Ms. Seiler's assessment essentially remained the same. Id. The test results suggested an improvement with respect to the left hand lateral pinch test and isometric lifting capacity. Id.

However, Sharpe reported a decrease in his ability to sit, stand and walk and climb stairs and engage in postural activities. Id. He also reported that he needs to periodically use a "recliner chair." Tr. 543. Before performing some physical therapy tests Sharpe rated his pain as a 4 on a scale of 1 to 10 and after the testing as a 10. Tr. 545.  It was reported that Sharpe had normal range of motion except with respect to lumbar flexion (bending forward). Id.

On July 11, 2013, Sharpe had an appointment at the Lebanon VA Medical Center with Ms. Laudermilch, the therapist. Tr. 539-540. Ms. Laudermilch stated that Sharpe "seems to be functioning well in life domains." Tr. 539. The results of mental status examination were essentially normal. Tr. 539-540. Ms. Laudermilch's diagnostic assessment was that Sharpe suffered from bipolar disorder and she gave him a GAF score of 64. Tr. 540. Sharpe also had an appointment with Ms. Laudermilch on August 14, 2013, at which similar findings were made except Sharpe was having some stress associated with contact with one of his ex-wives and his mood was neutral. Tr. 563-564.

On July 22, 2013, Sharpe apparently had an appointment telephonically with Dr. Dave, the primary care physician. Tr. 567-568.  During the phone call Sharpe's complaints of vomiting and headaches were considered. Id. With respect to Sharpe's gastrointestinal problems it was noted that Sharpe would have a

follow-up appointment with Dr. Shaikh, the gastroenterologist. Id. With regard to Sharpe's headaches it was recommended that Sharpe continue with his present treatment. Id.

On August 5, 2013, Sharpe had an appointment with Dr. Shaikh regarding his reflux disease. Tr. 566. Dr. Shaikh noted that Sharpe was presently on pantoprazole and that gastric emptying studies performed on July 2, 2013, were normal without evidence of gastroparesis (paralysis of the stomach muscles resulting in delayed emptying of the stomach into the small intestines) or gastric retention. Tr. 556-562 and 566-567. Dr. Shaikh stated that previous diagnostic tests confirmed the presence of a small to moderate sized hiatal hernia, associated with reflux. Tr. 566. Dr. Shaikh also stated that Sharpe continued to have symptoms of reflux and even hoarseness of voice (dysphonia) associated with the uncontrolled reflux disease. Id. Dr. Shaikh recommended a surgical consultation in light of the intractable nature of Sharpe's reflux disease and his lack of response to medications. Id.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Sharpe had not engaged in substantial gainful work activity since November 8, 2011, the alleged onset date set forth by Sharpe in his application. Tr. 13.

At step two of the sequential evaluation process, the administrative law judge found that Sharpe had the following severe

54

impairments: "lumbar disc disease, migraine headaches, affective
disorders, anxiety disorders and personality disorder[.]" Id.  The
administrative law judge found that Sharpe had the non-severe
impairments of allergies, chronic sinusitis, obstructive sleep
apnea, obesity and GERD. Id.  The administrative law judge did not
address or make a determination as to whether or not Sharpe
suffered from the medically determinable, severe or non-severe,
impairments of traumatic brain injury, occipital neuralgia and
impulse control disorder.[59]

At step three of the sequential evaluation process the
administrative law judge found that Sharpe's impairments did not
individually or in combination meet or equal a listed impairment.
Tr. 13-15.

At step four of the sequential evaluation process the
administrative law judge found that Sharpe had the residual
functional capacity to perform a limited range of sedentary work.
Tr. 15.  Specifically, the administrative law judge found that
Sharpe had the

> capacity to perform sedentary work as defined in 20 CFR
> 404.1567(a) subject to the following. He requires a
> sit/stand option at will; must never perform foot
> operations, kneel, crawl or climb ladders, is limited to
> occasional stairs, balancing, stooping, and crouching;
> must avoid exposure to hazards and bright lights. He is

---

[59]Dr. McAllister found that Sharpe suffered from impulse
control disorder.  Impulse control disorder does not fall into the
categories of affective disorders, anxiety disorders or personality
disorders under the Diagnostic and Statistical Manual of Mental
Disorders.

> further limited to work that involves, simple, routine repetitive tasks in a work environment free from fast-paced production involving only simple work-related decisions with few, if any, work place changes; no interaction with the public, occasional supervision and occasional interaction with coworkers but no tandem tasks.

Id. In setting the residual functional capacity, the administrative law judge purportedly relied on the opinion of the state agency psychologist, Dr. Gavazzi, who did not specify the medical records he was relying on, and the opinion of Dr. Todd-Pillman, who erroneously stated that Sharpe had not been diagnosed with TBI. Tr. 20. The administrative law judge gave significant weight to the opinion of Dr. Gavazzi and relied on the opinion of Dr. Todd-Pillman. The administrative law judge did not address in any meaningful way the VA disability rating of 90%. Furthermore, the administrative law judge in setting the residual functional capacity found that Sharpe and his girlfriend were not credible. Tr. 17 and 19.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Sharpe had the ability to perform work on a full-time basis as an inspector and table worker, and that there were a significant number of such jobs in the national economy. Tr. 21.

Sharpe argues, inter alia, that the ALJ erred in his consideration of the 90% disability rating of the Department of Veterans Affairs. We have thoroughly reviewed the record in this

case, which consists of 568 pages, and find substantial merit in Sharpe's argument.  The record was not sufficiently developed for the ALJ to disregard the VA determination in such a nonchalant and abbreviated manner.  Furthermore, the ALJ erred at step 2 of the sequential evaluation process by failing to consider all of Sharpe's medical conditions.  We will first address that error.

The administrative law judge did not make a definitive determination as to whether or not Sharpe suffered from TBI, occipital neuralgia and impulse control disorder. The Social Security regulations contemplate the administrative law judge first considering whether there are any medically determinable impairments, and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step

two.  However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity. The social security regulations mandate such consideration and this court has repeatedly so indicated. <u>See</u>, <u>e.g.</u>, <u>Christenson v. Astrue</u>, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); <u>Little v. Astrue</u>, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); <u>Crayton v. Astrue</u>, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo, J.); <u>Shannon v. Astrue</u>, Civil No. 11-289, slip op. at 39-41 (M.D.Pa. April 11, 2012)(Rambo, J.); <u>Bell v. Colvin</u>, Civil No. 12-634, slip op. at 23-24 (M.D.Pa. Dec. 23, 2013)(Nealon, J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

The failure of the administrative law judge to find the above referenced conditions - TBI, occipital neuralgia and impulse control disorder  - as medically determinable impairments, or to give an adequate explanation for discounting them, makes the administrative law judge's decisions at steps two and four of the sequential evaluation process defective.  The error at step two of the sequential evaluation process draws into question the ALJ's RFC assessment and the assessment of Sharpe's credibility.

The administrative law judge found that Sharpe's medically determinable impairments could reasonably cause Sharpe's alleged symptoms but that Sharpe's statements concerning the intensity,

persistence and limiting effects of those symptoms were not credible. This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Sharpe's medically determinable impairments. Furthermore, for the same reason, as well as his failure to personally observe her testimony as aforestated, the ALJ erred in discounting the statement of Sharpe's girlfriend.

The Court of Appeals for this circuit has held that a determination of disability by the Veterans Administration is entitled to substantial weight. Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1985). Furthermore, pursuant to 20 C.F.R. § 404.1512(b)5), the Commissioner is required to evaluate all the evidence in the case record that may have a bearing on the determination of disability, including decisions by other governmental agencies. It is also required that the Commissioner adequately develop the record so as to appropriately consider the determination of other governmental agencies. See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v.

Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate.  Id.

To reiterate what we consider most salient, this court cannot discern from the record that the ALJ placed substantial weight on the determination of the VA or appropriately considered it.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings consistent with the Order that follows.

An appropriate order will be entered.